IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 3:21-cr-026-JAG-1 |
| ODELL S. ANDERSON, SR., | |
| Defendant. | |

## **GOVERNMENT'S OBJECTIONS TO PRESENTENCE REPORT**

## **AND SENTENCING MEMORANDUM**

The United States of America, by and through its attorneys, Raj Parekh, Acting United

States Attorney for the Eastern District of Virginia, Olivia L. Norman, Assistant United States

Attorney, and Shennie Patel, Trial Attorney with the U.S. Department of Justice's Environment

and Natural Resources Division, hereby submits its Sentencing Memorandum.

Objection to the Presentence Report

The government respectfully objects to the guidelines calculation in the Presentence

Report ("PSR"), in that the probation officer grouped Count 1 (conspiracy to engage in a dog

fighting venture) with Count 2 (taking a minor to an animal fight), under U.S.S.G. § 3D1.2(b).

The probation officer explained that she grouped Counts 1 and 2 for guideline calculation

purposes because they involve the same victim and two or more acts or transactions connected

by a common objective or constituting part of a common scheme or plan. PSR ¶ 55. Based on

this grouping, the probation officer determined that defendant's offense level is 16. PSR ¶ 61.

With 3 points deducted for timely acceptance of responsibility, defendant's total offense level is

13. PSR ¶¶ 65. Defendant has 0 criminal history points, resulting in a Criminal History Category

I.  PSR ¶¶ 71. Defendant's advisory sentencing guidelines range is 12 to 18 months.

These two counts should *not* be grouped, however.  Rather, these two counts should be considered separate offenses because they involve distinctly different conduct, one of which is the engagement in dog fighting – with or without children in attendance – and the other specifically is taking a child to a dog fight, with no requirement that the adult who took the child to the dog fight actually engage in the dog fighting activity. Our argument is based on the following:

First, Section 2E3.1 does not include an enhancement for someone who, like defendant, committed both the conspiracy to engage in dog fighting and the separate offense of knowingly bringing a minor to a dog fight. Thus, such a defendant who committed both offenses would receive a windfall if the two offenses were grouped. Defendant would face the same offense level as his coconspirators who did not bring a young child to a vicious two-card dog fight.  Thus, for this reason alone, the two counts should not be grouped.[1]

Second, the counts do not involve the same victim. Count 1 does not have any victims in terms of persons, while Count 2 has a victim – a seven-year old child who witnessed almost two hours of dog fighting in a controlled, pre-planned dog fighting event in which two dogs died of their injuries in separate dog fights.

---

[1]      In related cases in the District of New Jersey (i.e. - cases which were part of the same originating investigation as defendant's and for which search warrants were all obtained on the same day as defendant's: Anthony Gaines – 17-cr-00309-001; Robert Elliott - 17-cr-00051-02; and Justin Love - 17-cr-00051-03), defendants either pleaded to or were convicted of at trial to a dog fighting conspiracy and separate multiple counts charging them with possession of dogs used in fighting ventures. Both judges for these cases independently held for all three of those defendants that offenses involving separate possession counts did not group because each individual dog was a separate victim or the guidelines did not reflect the seriousness of the offense if grouped.

Those cases were appealed, and the 3d Circuit affirmed both sets of sentencings, albeit on different grounds other than grouping. But the district court decisions are still good law in that each fighting dog possession count was not grouped for sentencing guidelines purposes. (Note these cases were all under the pre-2016 sentencing guidelines for animal fighting).

Third, taking a minor to a dog fight was not a common objective or scheme in the conspiracy to engage in dog fighting, and likewise, was not included as an overt act in the conspiracy charge. In fact, taking a seven-year-old child to a dog fight was an act decided separately by defendant, and it was not intrinsic to the dog fight or necessary for the dog fight to occur. It was also not part of the other coconspirators' shared goal, which was to sponsor or exhibit dogs in fighting ventures, as well as to sell, buy, possess, transport, deliver and receive dogs for them to participate in fighting ventures.

Fourth, since the enactment of the statute violated in Count 2, and based on a detailed review of court records, to date, there has been only one other federal case (*United States v. Peaks,* 1:16-cr-35 (W.D.Va. 2016) convicting a defendant of taking a minor to an animal fight (involving roosters). That case similarly involved a conspiracy count to engage in animal fighting (to fight roosters), as well as a count involving taking a minor to an animal fight against, one of the defendants. The indictment, charging five defendants, did not list taking a minor to the rooster fight as an overt act or object of the conspiracy, just like the case in front of the court today. The *Peaks* court accepted the parties' plea agreement and did not group those counts, thereby adding one level to the base offense level.

Here, if the two Counts are *not* grouped, the offense calculation under U.S.S.G. § 3D1.4 would increase the base offense level from 16 to 17 before any three-level reduction for acceptance of responsibility. The total offense level therefore would increase from level 13 (12 - 18 months) to level 14 (15 - 21 months).

In the alternative, if this Court determines that it is appropriate to group Counts 1 and 2, then the Court should apply the two-point enhancement for a vulnerable victim pursuant to U.S.S.G. § 3A1.1(b)(1).  First, if grouped, U.S.S.G. § 2E3.1 does not take into account that there is a

victim, let alone a vulnerable one. Indeed, the child was only seven years old. If grouped, defendant faces no additional punishment for taking a child of tender age to a violent, criminal dog fight. It would be as if that was of no consequence. But clearly Congress has punished the conduct as a separate crime, which means Congress does believe there should be a consequence for taking a child to a dog fight. If grouping does not embrace that consequence, then the vulnerable victim enhancement should apply to reflect that consequence that Congress intended. Indeed, such an additional consequence is necessary to stop the generational proliferation of illegal dog fighters.

The government has no further objections to the PSR, and as set forth below, recommends a Guidelines sentence using a total offense level of 14, ranging from 15 to 21 months.

## A.  RELEVANT FACTUAL BACKGROUND

Defendant pleaded guilty to two counts: (1) conspiracy to engage in an animal fighting venture, in violation of the Animal Welfare Act, 7 U.S.C. §§ 2156(a)(1) and (b), and 18 U.S.C. § 49; and (2) causing an individual under the age of 16 to attend an animal fight, in violation of the Animal Welfare Act, 7 U.S.C. §§ 2156(a)(2)(B), and 18 U.S.C. § 49 . ECF No. 15. In support of that plea, defendant signed a statement of facts in which he admitted he conspired with others starting from in or before April 2013, and continuing through and including June 16, 2016, to sponsor and exhibit dogs in animal fighting ventures, as well as to sell, buy, possess, train, transport, deliver, and receive dogs for the purposes of having the dogs participate in animal fighting ventures. ECF No. 16. There is no evidence that defendant actively withdrew from the conspiracy by ending all contact with all of his coconspirators following the search warrant on his residence.

**Defendant's Participation in Various Dog Fights**

Defendant admitted to having a dog fighting kennel named "MOB" aka "Make or Break," which he used to identify the dogs he sold and fought. Defendant further admitted to setting up multiple chain weight dog fights with coconspirators, including EP and CM, from 2013 to 2016. Electronic evidence corroborated that defendant maintained frequent contact with coconspirators EP, CM, and multiple other fighters, from 2013 to mid-2016 and set up countless fights at his coconspirators' locations. Defendant also admitted to directly participating in these chain weight dog fights, as well as in dog fights involving a several-week training regimen before the events, planned months in advance, such as the April 3, 2016, two-card dog fight in King George, Virginia, that included all four coconspirators. The evidence also corroborated that defendant facilitated or set up dog fights for other fighters, such as coconspirators CM, using his dog fighting connections.

**Defendant's Participation in a Dog Fight Event on April 3, 2016**

Specifically regarding the April 3, 2016, dog fight, defendant established the rules with coconspirator CH for the two dog fights to occur that night in King George between defendant and coconspirator MA from New Jersey, and between coconspirators EP and CM. The rules included "no open invitations" and "no walk-ins" in order to avoid unknown persons from attending the secret dog fight event. Defendant admitted to establishing with coconspirators EP and CM the key terms for the fight he set up to occur between them, including their dogs' weights on the day of the fight, the forfeit amount should either of them come in over the agreed-upon weight, and their wager amounts.

Defendant admitted to traveling from the District of Columbia to the dog fight event in Virginia. Video surveillance evidence showed defendant meeting up with others, including

coconspirators EP and CH, in the Walmart parking lot in King George, Virginia, before being led to the undisclosed fight location. Video surveillance revealed defendant exiting his car in the parking lot with a child he later identified to law enforcement as his seven-year-old son. Surveillance evidence, as well as the defendant's statements, indicated that he traveled to a house in King George, belonging to coconspirator CH's relative, where the dog fight event took place. Defendant's dog won; his opponent's dog died as a result of injuries from the dog fight, and defendant's opponent and coconspirator MA dumped the dog in a dumpster after the fight as he drove back to New Jersey. Coconspirator CM's dog won against coconspirator EP's dog; EP's dog also died as a result of injuries sustained from the dog fight.

During the search warrant in June 2016 (see details below) when agents asked how the fight ended, defendant responded, "One of them quit. How it always end[s], except for when you go into me. I can go until my dog kill[s] your dog… My dog bites you anywhere they can bite you to win … and once again, if you don't kill it in 30 minutes you won't beat it [defendant's dog]." Defendant then told law enforcement his dog won the fight and "limped for three days, then he was fine." As stated above, the opponent's dog died on the way home and his owner threw him into a dumpster.

**Defendant's Grand Champion Dogs**

 

In preparation for the April 2016 dog fight event, defendant trained his male dog, "Cookie Monster" aka Grand Champion Cookie and frequently texted known and unknown dog fighters photos and videos of him training the dog who he referred to in the texts as "Dr. Pooh's GRCh. Cookie."[2]  He informed agents during the June 2016 search warrant that the dog he fought in the April 2016 dog fight was his seven-year-old son's "favorite dog … that he loved so much." (See Exh. A, pages 19-20, photos of Cookie with defendant's son during the training period). Defendant also told agents that they had just seized his champion fighting dog who fought in the April 2016 fight. (See photo above on left). Defendant did not inform agents that they had also seized his other champion fighting dog Candyman. (See photo above on right). Following further investigation, the government determined that there were two champion fighting dogs in defendant's yard the day of seizure. (See Exh. A, pages 2-6; 8-9).

---

[2]      Cookie Monster likely had reached Grand Champion status by the time defendant was preparing him for the April 2016 fight, which means the dog had won, without any losses, at least five fight events. "Pooh" or "Poohie" is defendant's nickname in his dog fighting circle.






**Search Warrant in June 2016**

On June 1, 2016, agents seized from defendant's residence four pit bull-type dogs maintained in conditions consistent with use in dog fighting ventures. (See Exh. A, pages 2-13). The dogs were housed separately, outdoors in crude wooden/plastic housing, wearing thick collars, and/or tied to heavy chains that limited their access. The dogs all had visible scarring and tears consistent with use in a dog fighting venture.

Veterinary assessments of the dogs indicated all of the dogs had medical issues, including visible inflammation, anemia, thinning of hair, scars, and tears on noses, forelegs, hind legs, necks, ears, and faces. The young female located in a separate crate with no covering was also clearly underweight. (See Exh. A, pages 10-12).

In addition to dogs, law enforcement also seized significant equipment used to maintain and train dogs for fighting purposes. In particular, agents seized fighting dog pedigrees and

breeder paperwork, as well as multiple dog crates, dog leashes, collars, weight harnesses, and "Bark Stop" collars. Some of the collars and harnesses were equipped with heavy weights or were attached to heavy, large-link chains. Dog fighters frequently use such equipment to strengthen and bulk up the dogs' necks for dog fights. (See Exh. A, page 27, photo of dog defendant trained with weighted collar).

Defendant also possessed other training tools, including a treadmill and a ceiling hook to hold a rope and lure, which was used to strengthen his dogs' jaw strength and jaw gripping stamina when biting. Defendant informed law enforcement that he used this hook and lure for a dog to hang onto for "maybe two hours, an hour." (This type of hook is used to suspend a rope with a lure (such as a rubber Kong dog toy), which is then grabbed onto by the dog and held onto indefinitely to strengthen the dog's neck and jaw muscles).

Finally, agents seized various medical first aid pet supplies, including horse/swine antibiotics, muscle stimulant, various types of veterinary wound dressing, and "Tetanus Antitoxin" (for veterinary use in cattle, horses, sheep, swine for treating of deep penetrating wounds that may have become contaminated with soil).

**Seized Electronics Corroborated his Dog Fighting Involvement**



Seized electronics contained photos and videos of defendant training his dog, Cookie Monster – in preparation for the April 2016 dog fight – running on the treadmill at a fast speed, holding onto a rope lure and hanging (see photo on left), and running outside at night pulling heavy chains. Specifically, throughout the months of



February, March, and right up to the fight event in April 2016, defendant sent out these training photos, videos, as well as details regarding the dog's diet, to other dog fighters. After winning the dog fight, defendant texted photos (including the photo above of the dog on a leash) and an announcement boasting his dog's win: "He's a hell of a bulldog won over G Grove Kennels jungle in 41 minutes." G Grove Kennels was the kennel name under which coconspirator MA fought.

Defendant proudly told agents that he had an "impeccable record… 304 wins … three losses, the three losses were somebody else's piece of shit … that's my career record," (defendant's statement indicates he had fought 307 fights at the time of the search warrant with only three losses), and that most of this dogs were from the Chinaman blood line "with a quarter Bolio Tombstone," which is a line of breeding bloodline associated with a nationally well-known dog fighter. However, defendant repeatedly and falsely claimed that he was not a big dog fighter and had been out of the game for a while, despite admitting to the number of fights in which he had participated and that he had been fighting all of this life. Consequently, following the search warrant and defendant's interview, agents continued their investigation into defendant's involvement with other dog fighters, and ultimately determined the full extent of his involvement into dog fighting ventures right up until the search warrant.

Defendant's electronics contained a wealth of evidence showing, among other things, that defendant frequently maintained contact with coconspirators CM, EP, and CH up until agents executed a warrant on his residence in June 2016. Cell phones seized from his coconspirator CM, however, indicated that defendant continued to have contact with coconspirator CM until July 12, 2018, (the day following the search warrant on CM's residence). Review of coconspirators

CH and EP's electronics indicated they saved defendant's post-search warrant cell phone number in their phones' contacts lists.

Defendant admitted to law enforcement to being a longtime dog fighter and that he also got paid to condition other people's dogs for fights. He also provided details regarding his training keeps (the approximately six to eight-week rigorous training period immediately before the fight), his dog conditioning, and his actual dog fighting performance. He also admitted to the breeding and selling of dogs for use in dog fighting. Electronic evidence as early as 2013 corroborated that he often texted other fighters detailing how his dog at the time was doing in his training keep for an upcoming dog fight. He also frequently texted fighting training tips to other dog fighters. For instance, in February 2015, defendant texted another fighter, with whom he often communicated, the following training tips: "When he stop [,] hit him with it. … do it for a couple days … only do it from the back of him and say ["]let's work go get it etc ["] … Never hit him from the front … Hit him in the ass end or his balls." Likewise, there are countless videos and photos of defendant training dogs for fights throughout 2014 up until April 2016.

Electronic evidence seized from his residence corroborated his statements – that he was indeed a long-time dog fighter and an involved one at that. One of the cell phones seized by agents in June 2016 was quite clearly his "dog fighting phone" and included texts (close to 5,000) from 2015 through to April 30, 2016. Most texts discussed dog fighting, covering topics such as his training keeps, the puppies and adults he had for sale, and the fights he was setting up or had recently fought, along with relevant photos attached to the texts. Electronic evidence revealed that he often bought and sold dogs, frequently changing the size of his yard(s). His phones also included videos of one of his yards (not the one agents searched in June 2016) that represented a typical dog fighting venture setup with multiple dogs, separated outside, and tied to

heavy chains attached to the ground with access to plastic blue barrels as housing. These videos included his voice talking to the dogs while training them on poles or chains. His contacts list contained countless names along with the words "pups" or "dogs" next to the names, which was his method of identifying the person's connection.

Throughout 2013, 2015, and 2016, defendant contacted other dog fighters either wanting to buy or sell adult dogs, including some of his own adult dogs. Beginning November 2015 to the end of January 2016, electronic evidence revealed that defendant often owned multiple adult dogs as well as puppies at one time. In December 2015, he texted photos of newborn puppies to his fellow dog fighters. On January 19, 2016, defendant texted "Boone" offering dogs for sale because "I have to cut my yard down asap … I need to get rid of them [two females] today." Other evidence confirmed the sale. On January 23, 2016, he texted photos of several dogs in his yard (the same one agents searched), outside in the snow, along with their names. (See Exh. A, page 28). These dogs were not the same ones seized by law enforcement five months later.

His cell phones revealed his extensive research into dog training as well as fighting dog pedigrees, which he shared with others, especially when he was selling dogs. Throughout the conspiracy, up until the search warrant on his residence, he sent countless texts advertising his breeding results (i.e., involving "good and consistent [fighting] blood"; "Top quality blood that's bite em down kill em mix") and his offers for sale of the puppies, some of them for as much as $1000 to $1,200 in May 2015.

His phones also contained "proof of breeding" photos, some of which included photos of dogs being bred while restrained, with the nose of one of the dogs being taped shut with duct tape. (See Exh. A, page 24).  In April 2016, defendant sold a puppy from his "dad to daughter breeding" to another fighter, "Boone" who he frequently contacted and to whom he had sold

dogs previously. Defendant clearly had not been "out of the game" for a long time before the search warrant as he repeatedly claimed to law enforcement in June 2016.

## B.  LEGAL FRAMEWORK

The Animal Welfare Act makes it unlawful to "knowingly sponsor or exhibit an animal in an animal fighting venture" – *i.e.*, the animal fights themselves. 7 U.S.C. § 2156(a)(1). Recognizing that it is extremely difficult to detect a dog fight in progress – and not wanting law enforcement to wait until after dogs are maimed or killed in fights to try to disrupt the unlawful enterprise – Congress also criminalized the many predicate activities without which animal fighting would not occur. In particular, it is also unlawful to "knowingly sell, buy, possess, train, transport, deliver, or receive any animal for purposes of having the animal participate in an animal fighting venture." 7 U.S.C. § 2156(b). Each of these violations is punishable by the same maximum penalty – five years in prison. 18 U.S.C. § 49. The Animal Welfare Act also makes it unlawful to "knowingly cause an individual who has not attained the age of 16 to attend an animal fighting venture," 7 U.S.C. § 2156(a)(2)(B), punishable by a maximum penalty of three years in prison. 18 U.S.C. § 49.

## C.  BACKGROUND REGARDING DOG FIGHTING

An organized dog fighting venture such as the one in which defendant and his coconspirators were involved bears no resemblance to the territorial quarreling pet dogs might have over food or a toy. It is a form of cruelty to animals – including the extreme forced weight loss and often grueling training involved before a match fight, the untreated injuries sustained inside the fighting ring by both dogs involved, and the not-so-immediate deaths occurring *after* the dog fights from injuries. These dogs do not enjoy the lives of a pet and many of these dogs spend most of their lives in cages or restrained by heavy chains outdoors, and are kept in close

distance to other fighting dogs, keeping the anxiety level high. Many dogs are exposed to "roll" or "play" fights in which the dogs are trained to lunge at each other under controlled conditions – sort of a training to test the dogs' aggressiveness or "gameness" to fight. Overall, dog fighting involves taking advantage of pit-bull type dogs' eagerness to please humans, all for gambling purposes, possible financial gain, or a disturbing form of "entertainment."

### D. FEDERAL DOG FIGHTING CASELAW

Congress first enacted the federal animal fighting prohibition in 1976.[3] It was not until approximately twenty-two years later that the statute was actually prosecuted in 1997 and not again until the prosecution of Michael Vick in 2007, in this very division of the Eastern District of Virginia. The Vick case exposed the public to the extreme animal abuse involved in dog fighting, including the animal suffering that occurs before, during, and after dog fights. In particular, the defendants in that case admitted as part of their guilty pleas to having routinely executed underperforming fighting dogs by drowning, hanging, and other brutal means. The following year, Congress increased the penalty from a misdemeanor to a five-year felony and significantly broadened the scope of the offense.[4] In 2014, Congress amended the federal animal fighting statute to include as a felony, knowingly causing a minor to attend an animal fighting venture.

Since 2008, law enforcement has increased its dog fighting prosecutions, but overall, only a few dozen cases have resulted. However, a notable trend emerged of above-Guidelines sentences, based primarily on the cruelty of the offense. Consequently, recognizing that a base offense level of 10 was inadequate, the U.S. Sentencing Commission increased the base offense

---

[3]     See Pub. L. No. 94-279, § 17, Apr. 22, 1976, 90 Stat. 421.
[4]     See Pub. L. No. 110-234, Title XIV, § 14207(a), May 22, 2008, 122 Stat. 1461 (initial passage); Pub. L. No. 110-246, § 4(a), Title XIV, § 14207(a), June 18, 2008, 122 Stat. 1664, 2223 (re-enacting entire Farm Bill after enrollment glitch).

level to 16 – the level at which it remains today [U.S.S.G. § 2E3.1] – stating that the increased base offense level "better accounts for the cruelty and violence that is characteristic of these crimes." Sentencing Guidelines for United States Courts, 81 Fed. Reg. 27,262, 27,265 (May 5, 2016).

Many defendants in dog fighting cases filed shortly before or since the increased offense level still received above-guidelines sentences, based on factors including other crimes involved, a defendant's extraordinary cruelty to the animals, or the defendant's offense involving a fighting venture on an exceptional scale. See Application Note 2 to U.S.S.G. § 2E3.1 (allowing for upward departure). Generally, courts have assessed extraordinary cruelty to be evidence beyond that which is intrinsic in the fighting pit, such as the extreme inhumane killing of dogs outside of the ring (*i.e.,* – due to losing a fight) or severe neglect of the animals (*i.e.,* – suffering from untreated dog fight injuries). Likewise, an upward departure based on animal fighting on an exceptional scale involves an offense with an unusually large number of animals. Although not all federal defendants in dog fighting cases have received above-Guidelines sentences, there has been a clear trend among judges in these cases to impose significant Guidelines sentences.[5] In many instances, the above-Guidelines sentences made up for the fact that the Guidelines did not account for the different levels of dog fighters and the varying degree of their involvement in a dog fighting enterprise.

The government submits that a Guidelines sentence is sufficient to meet the goals of sentencing based on the following analysis.

---

[5]        See Exh. B for list of examples of sentencings in various federal dog fighting cases.

### E.  SENTENCING ANALYSIS

#### 1.  The Government Argues the Guidelines Range is 15-21 Months.

As stated above, the PSR calculates defendant's total offense level as 13, derived from a base offense level of 16 for the count of conviction. See PSR at ¶¶ 65; U.S.S.G. §§2E3.1(a)(1), 2X1.1. As stated above, the government disagrees with this total offense level and argues that it should be increased to a total offense level of 14. Applying a total offense level of 14 to Defendant's criminal history category of I, the final Guidelines range should be 15 to 21 months.

#### 2.  A Guidelines Sentence is Consistent with the Goals of Sentencing Set Forth in 18 U.S.C. §3553(a).

After making the initial Guidelines calculation, a sentencing judge must then consider the seven factors outlined in Title 18, United States Code, Section 3553(a):

> (1)   "the nature and circumstances of the offense and the history and characteristics of the defendant;"
> (2)   the four legitimate purposes of sentencing;
> (3)   "the kinds of sentences available;"
> (4)   the Guidelines range itself;
> (5)   any relevant policy statement by the Sentencing Commission;
> (6)   "the need to avoid unwarranted sentence disparities among defendants;" and
> (7)   "the need to provide restitution to any victims."

18 U.S.C. § 3553(a)(1)-(7). See also United States v. Hughes, 401 F.3d 540 (4th Cir. 2005).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, including:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)   to afford adequate deterrence to criminal conduct;
> (C)   to protect the public from further crimes of the defendant; and
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent a District Court imposes a sentence outside the range recommended by the Guidelines, the Court must "consider the extent of the deviation and ensure

that the justification is sufficiently compelling to support the degree of the variance." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (quoting Gall v. United States, 128 S. Ct. 586, 597).

This is a federal dog fighting case in which the defendant knowingly conspired with other dog fighters and engaged in varying activities supporting a dog fighting venture that covered several states. The defendant's criminal conduct involved wagering and the suffering of dogs and continued to promote a cruel and violent form of entertainment and status. The evidence shows that many of these fights were chain weight or "roll" fights and others were the dog fights that involved a rigorous several-week training regimen, and usually lasted until one dog died or was near death. We know that the April 3, 2016, dog fight involving defendant's dog lasted approximately 45 minutes, that the defendant's dog won and the losing dog died as a result of his injuries. By defendant's own words, usually when his dogs fight, other dogs die. We also know that the other fight involving coconspirators EP and CM also lasted approximately 45 minutes and that EP's dog also died due to injuries.


We also know that the number of dogs defendant owned, possessed, and trained at any particular time frequently changed because he consistently engaged in the breeding and selling of fighting dogs, as shown by the number of breeding photos and dog fighting pedigrees he exchanged with other dog fighters, as well as texts discussing sales and showing tracking receipts from Western Union payments, evidencing sales. Despite his statement to law enforcement that these dogs were like children to him, defendant's dogs were clearly not his pets, nor were they intended to be anyone else's pets, and he fought and/or sold

them like property. They lived in terrible, isolated conditions, in all sorts of weather, and were meant to serve only one purpose: being part of a dog fighting venture. (See photo above of one of the several dogs, living outside in his yard on January 23, 2016. This is the same yard agents searched in June 2016).

There are clearly varying levels of dog fighters: some who merely attend a fight here and there when invited; some who are professional handlers and are known as legends in the sport and dedicate all their time and money to their venture; and then there are some, like the defendant, who considers himself a professional winning fighter with the decades of experience and time to actively engage in the dog fighting world, by continuously breeding, training, and fighting dogs.

As detailed above, agents found and seized four dogs at defendant's residence, although evidence from just a few months earlier indicated that he previously possessed more dogs, as he often bought and sold dogs, which varied the size of his yard. He also likely owned more dogs, but at a different location, based on videos found on his phone of him working dogs in a field at location other than his residence. Defendant also possessed items, as detailed above, commonly used by dogfighters to train dogs for fights and treat them when injured without having to seek a veterinarian.

Essentially, the defendant was a seasoned dog fighter with the skills and connections to be known as a fighter who rarely loses – something only an experienced and hard-working fighter can claim. In this case, a Guidelines sentence is necessary to meet the ends of Section 3553(a), as described in further detail below.

(a)      **Nature and Circumstances of the Offense**

The PSR, Statement of Facts, and overt acts as outlined in the Information, contain numerous examples of defendant's criminal conduct. Defendant's conduct demonstrates that his offenses were intentional and significant. In fact, his criminal conduct did not involve a solitary violation or participation in a single fight that might be explained as a single instance of bad judgment or a limited scope of misconduct. Rather, the defendant played many roles. As a sponsor, transporter, trainer, and dog fighter, defendant persistently committed offenses over an extended period of time and with full knowledge that he was breaking the laws of the United States.

A dog fighting venture requires significant dedication over time, and defendant, as well as his coconspirators devoted their time and effort toward engaging in this criminal activity. Any sentence should reflect the seriousness of the defendant's extensive involvement.

(b)      **History and Characteristics of the Defendant**

As described in more detail above, evidence gathered in this investigation and items seized from the defendant and his coconspirators showed that defendant had been involved in dog fighting since *at least* 2013, demonstrating that his involvement was not fleeting or casual, but a significant feature of his entire life.

As described in the PSR, the defendant has been married three times and has five children. See PSR ¶¶ 93-98. He did not complete high school and has a history of domestic abuse, as well as drug abuse issues. See PSR ¶¶ 101-103. Since 2017, he has owned his own business and brings in a good income from that business. See PSR ¶¶ 106. Following the federal search warrant on his residence in 2016, defendant turned to the church, although recently he dropped out of a religious institute without obtaining a diploma.

In reading the PSR, defendant now has a good job and is newly married to a supportive wife. But for years, his life was entrenched in dog fighting; an illegal activity he hid from public view, until June 2016, and that fact cannot and should not be erased or forgotten. Defendant proudly boasts his fighting record and viewed his dogs as winners and killers, and as a result, caused a great deal of unnecessary suffering over the years.

### (c)     Seriousness of the Offense, Respect for the Law and Just Punishment

Over the last decade, there has been increased public awareness of the serious, violent nature of animal fighting, as reflected by Congress's repeated strengthening of the Animal Welfare Act.[6] The recent amendment of the substantive guideline by the Sentencing Commission, as discussed above, further underscores the seriousness of the offense. See Sentencing Guidelines for United States Courts, 81 Fed. Reg. at 27,265 ("[t]he Commission [ ] determined that the increased base offense level better accounts for the cruelty and violence that is characteristic of these crimes"). Also, given the extensive, secretive networks that are needed to solicit opponents and to locate, buy and sell dogs of particularly coveted bloodlines, dog fighting is organized crime in the traditional sense of that term. The seriousness of this offense weighs in favor of a significant Guidelines sentence.

---

[6] Congress has strengthened the law four times over the last thirteen years, including: the Animal Fighting Prohibition Enforcement Act of 2007, Pub. Law 110–22, 121 Stat. 88, which increased animal fighting from a misdemeanor with a one-year statutory maximum to a felony with a three-year statutory maximum; the 2008 Farm Bill, Pub. Law 110–234, Sec. 12407, 122 Stat. 923, which raised the statutory maximum to five years, relaxed the interstate commerce element, and added substantive prohibitions; and the 2014 Farm Bill, Pub. Law 113-79, Sec. 12308, 128 Stat. 649, which made attending animal fights a misdemeanor offense and added a felony offense for bringing anyone 16 years or younger to an animal fight.

**Taking a Minor to a Dog Fight**

Defendant acted in a way none of his coconspirators did in this case: he exposed his elementary-aged son to the violence that is dog fighting. Specifically, he brought his seven-year-old to the April 2016 dog fight so that his son could see his favorite dog fight another dog. This fact is stunning and causes one to pause and consider why a loving father would make such a bad choice. Not only was the location of the dog fight unknown to most of the participants, therefore raising questions of safety, but it is also well-known that a dog fight does not involve two dogs simply wrestling over a toy until one of the dogs "gets the toy." To the contrary, a typical dog fight show like the one his son attended, involves two dogs, trapped in a wooden pit, being cheered on by sponsors and participants, while violently fighting each other by biting and ripping each other's flesh.

Clearly, defendant was confident that his son's favorite dog would win and therefore, his son would not have to witness Cookie Monster's death. Instead, however, defendant's child most likely witnessed the losing dog's death or the gruesome injuries the losing dog sustained and that ultimately killed the dog. And there were two fights, and according to defendant, and the GPS tracker law enforcement had on his car, defendant and his son stayed at the event until both fights were done. The losing dog in the second fight also died of its fight injuries. When briefly interviewed by law enforcement (with defendant's consent) two months after the fight during the search warrant on defendant's house, his son did not express anything shocking or highly upsetting when watching the dog fight. And that causes yet another pause. On the one hand, it is a good thing that the boy did not see his favorite dog die or suffer. On the other hand, he witnessed at least one fight that ended in another dog's death. Hopefully, that young boy was not indifferent or desensitized to the pain and violence these dogs suffered during the two fights.

Hopefully, this young boy does not perpetuate the circle of animal suffering and abuse that he witnessed. Defendant made that choice to take his young son to witness, firsthand, the violence in dog fighting that defendant enjoyed for so long and would have continued to enjoy but for getting caught by federal law enforcement. The seriousness of this offense also weighs in favor of a significant Guidelines sentence.

### (d)      Need to Afford Adequate Deterrence to Criminal Conduct

Deterrence comes in two forms: deterring the current defendant from committing additional crimes, and deterrence of future defendants from committing similar crimes. Dog fighting is a highly secretive enterprise that is difficult for law enforcement and investigative professionals to infiltrate. A dog fighting investigation requires many of the same skills and resources employed in major undercover narcotics investigations, thus challenging the resources of any agency that seeks to respond to it.

Without a doubt, defendant knew dog fighting was illegal during all those years he fought dogs. In May 2015, for instance, he texted a news release link to a fellow dog fighter and also coconspirator CM regarding a recent police raid on a dog fighting ring in the West Virginia area. Evidence obtained in this case also shows that defendant had been visited numerous times at his residence following cruelty or neglect complaints, although no charges resulted:

- In February 2013, Park Police responded to a complaint that defendant was dragging a dog on a pole in a soccer field near his residence. Officers noticed that the dog was fairly scarred up with old scars. Defendant claimed that he recently acquired the dog from another guy and that defendant was training the dog for pulling competitions.

- In November 2014, at the same address federal agents searched in 2016, there was a complaint of multiple dogs isolated from each other outside in the cold weather chained up to heavy chains attached to axels in the ground. He told animal control that his newly acquired dog, "Cookie" was in the house, that he did not plan on keeping most of the dogs officers saw in his yard, and that he was involved in weight pulling competitions.

22

- In March 2015, animal control responded to a similar complaint. They noted in their report that the water buckets outside were frozen.[7]

- In June 2015, animal control responded again to a dog chained outside in the hot sun.

In defendant's case, it does appear that he is now finally out of the game once he realized that it was not animal control visiting his home, but instead, federal agents executing a search warrant on one of his yards and residence. However, as detailed above, he did not block all contact with all of his coconspirators after the search warrant on his house.

Given the limited law enforcement resources available for cases such as this, and the strain it places upon municipal and charitable animal shelters, it is imperative that the sentences imposed in the cases that *are* able to be brought send a strong message of deterrence. Dog fighting tends to involve a private, closely-knit groups of individuals, but nevertheless, many other dog fighters are watching the outcome of this and other federal dog fighting cases in the country. Those who choose to brutalize animals for entertainment, profit, and status must know that their criminal conduct will be severely punished. Consequently, a Guidelines sentence as set in the Guidelines range calculated in the PSR is needed to "afford adequate deterrence to criminal conduct," both to defendant and to other similarly situated potential offenders. 18 U.S.C. § 3553(a)(2)(B).

### (e)    Need to Avoid Unwarranted Sentence Disparities

Defendant's advisory guidelines range, as argued by the government, reflects the facts and circumstances of this case, and his criminal history. The multi-defendant federal dog fighting cases cited in Exhibit B to this memo also provide a reference point in avoiding unwarranted sentencing disparities under 18 U.S.C. 3553(a)(6). Some of those cases cited defendants with

---

[7]    See also Exh. A, page 28, of photos his yard with dogs housed outside in the snow. Defendant texted these photos in January 2016 to dog fighters he frequently contacted.

varying roles in the conspiracy, and their varying sentences reflected that. Some of the other cases, as in this matter, reflect defendants with similar roles and involvement, and their sentences reflected that also. None of those cases, however, include a charge involving taking a minor to a dog fight, as this is the first one. Following a comprehensive search, the government determined that the only other time a defendant has been convicted under 7 U.S.C. § 2156(a)(2)(B) was in November 2016 in the Western District of Virginia when Russell D. Peaks plead guilty for allowing his thirteen year old son to fight a rooster at a cock fight. He also plead guilty to an animal fighting conspiracy and drug distribution. Based on his prior criminal history and offenses as charged, Peaks was sentenced to 24 months on each count, to be served concurrently. See United States v. Peaks, et al., 1:16-cr-35 (W.D.Va. 2016).

The coconspirators in this case on all accounts were on par with each other as far as their experience, ages, and involvement in dog fighting ventures. They all possessed dogs over the years, and they were all involved in breeding, training, and fighting dogs – sometimes the fights were significant events, and others were roll fights or fights testing the dogs' "gameness" or willingness to fight. They all had similar training equipment and medical kits; they often shared the same transporters, and they often interacted with some of the same people in dog fighting. Only two of the coconspirators, however, owned champion fighting dogs (an accomplishment that requires intense dedication and skill): defendant and his coconspirator CM.

At this time, only two of defendant's coconspirators has been sentenced and that is coconspirator MA from New Jersey who fought his dog and lost against coconspirator OA in the April 3, 2016, dog fight. On June 15, 2017, coconspirator MA plead guilty to sponsoring a dog in the April 2016 fight, as well as for possession of 18 dogs for purposes of participation in an animal fighting venture. He was initially charged in a complaint with a dog fighting conspiracy

beginning in 2015 and ending in 2016, which involved eight other defendants. He was the first defendant to plead guilty to the charges against him. Coconspirator MA was sentenced, *under the pre-2016 guidelines*, with a Guidelines range of 6-12 months, to a term of 24 months of imprisonment on each of the counts, to be served concurrently, and a $1,000 fine. See Transcript of Sentencing at 67-68, United States v. Atkinson, No. 3:17-CR-222-PGS-1, (D.N.J. Apr. 18, 2018) (Using pre-2016 Guidelines; varying upwards by 12 months because "[t]here needs to be a longer period of imprisonment. We need to give a message to society that anyone that's involved in dog fighting is going to be subject to greater penalties than this, because the activity itself is depraved – it's just a very depraved activity; it's horrific and it's upsetting to everybody to see that our animal friends would be treated in such a manner").

The other coconspirator sentenced to date is coconspirator CM who also participated in the April 2016 dog fight with defendant and was found with one dog in July 2018. This court sentenced him on August 27, 2021, to 12 months and one day jail based on the specific charges as they applied to the coconspirator.

To avoid a sentencing disparity with the defendant's coconspirators and to accurately reflect the comparative length and significance of the defendant's involvement in dogfighting, as well as for the specific charges to which he plead guilty, a Guidelines sentence for the defendant is merited.

3.      **Special Conditions of Supervised Release**

The Court should also include the special condition of supervised release recommended in the PSR. See PSR ¶ 5. The condition that Defendant be prohibited from possessing or owning any pit-bull type dogs or any breeds of dogs he intends to breed and/or sell, either personally or

through a third party, is commonly imposed in dog fighting cases, and is appropriate given the nature of the offense.[8]

## F. CONCLUSION

Considering all of the 18 U.S.C. § 3553 sentencing factors, including the defendant's complete and timely acceptance of responsibility and the relevant Guidelines provisions and case law discussed above, a Guidelines sentence within the total offense level of 14 would be sufficient without being greater than necessary to fulfill the purposes of sentencing. The Court should also impose a term of three years of supervised release in this case. Given Defendant's long-running participation in dog fighting, the maximum term of supervised release – three years

---

[8]     See, e.g., United States v. Moody, 3:21-cr-24, ECF No. 22 (Judgment) (E.D.Va. August 27, 2021); United States v. Andrews, 7:16-cr-122, ECF No. 358 (Judgment) at 6 (E.D.N.C., Dec. 22, 2017); United States v. Love, 3:17-cr-51, ECF No. 295 (Judgment) at 3 (D.N.J. July 8, 2019).

– is appropriate, to help ensure that he does not return to the unlawful activity that played a prominent role in his life.  18 U.S.C. § 3583(b)(2).

Respectfully submitted,

| RAJ PAREKH<br>ACTING UNITED STATES ATTORNEY | TODD KIM<br>ASSISTANT ATTORNEY GENERAL |
|---|---|
| _____/s/_____<br>Olivia L. Norman<br>Assistant United States Attorney<br>V.S.B. No. 31418<br>Office of the United States Attorney<br>919 E. Main Street, Suite 1900<br>Richmond, Virginia 23219<br>(804) 819-5475<br>(804) 771-2316 (facsimile)<br>Olivia.Emerson@usdoj.gov | _____/s/_____<br>Shennie Patel<br>Trial Attorney, Environmental Crimes<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>150 M Street NE, Suite 4.111<br>Washington, D.C. 20002<br>(202) 305-0295<br>(202) 514-8865 (facsimile)<br>Shennie.Patel@usdoj.gov |

CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of September, 2021, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of

such filing (NEF) to the counsel of record.


By: _____/s/_____
    SHENNIE PATEL
    Trial Attorney, Environmental Crimes Section
    Environment and Natural Resources Division
    U.S. Department of Justice
    150 M Street NE, Suite 4.111
    Washington, D.C. 20002
    (202) 305-0295
    (202) 514-8865 (facsimile)
    Shennie.Patel@usdoj.gov